# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRICK HALL | : |
|     Plaintiff | : CIVIL ACTION |
| vs. | : NO. 17-CV-4738 |
| JOHN WETZEL, et. al. | : |
|     Defendants | : |

## DECISION

**JOYNER, J.**                                                                                **February 21, 2018**

This matter has been brought before the Court on Motion of the Plaintiff, Darrick Hall, for Preliminary Injunction. Following hearings before the undersigned on January 30 and 31, 2018, this Court finds that the relief sought is properly granted. Based upon the record, we now make the following:

## FINDINGS OF FACT

1. Plaintiff is Darrick U. Hall, who was convicted of first degree murder and related offenses in Pennsylvania state court in 1994 and sentenced to death. Since November, 1994, Mr. Hall has been continuously confined in the Capital Case/Restricted Housing Unit at the State Correctional Institute ("SCI") Graterford.

2. Defendant John Wetzel is the Secretary of the Pennsylvania Department of Corrections with an employment/mailing address at 1920 Technology Parkway, Mechanicsburg, PA 17050-8507.

3. Defendant Shirley Moore Smeal is the Executive Deputy

Secretary of the Pennsylvania Department of Corrections with an employment/mailing address at 1920 Technology Parkway, Mechanicsburg, PA 17050-8507.

4. Defendant Michael Wenerowicz is the Deputy Secretary of the Eastern Region of the Pennsylvania Department of Corrections with an employment/mailing address at 1920 Technology Parkway, Mechanicsburg, PA 17050-8507.

5. Defendant Cynthia Link is the Superintendent of SCI Graterford with an employment address at 4533 W. Skippack Pike, Schwencksville, PA 19473 and mailing address at P.O. Box 246 Graterford, PA 19426-0246.

6. Defendant Laura Banta is the Deputy Superintendent for Centralized Services at SCI Graterford with an employment address at 4533 W. Skippack Pike, Schwencksville, PA 19473 and mailing address at P.O. Box 246, Graterford, PA 19426-0246.

7. James Meintel is the Deputy Superintendent for Facilities Management at SCI Graterford with an employment address at 4533 W. Skippack Pike, Schwencksville, PA 19473 and mailing address at P.O. Box 246, Graterford, PA 19426-0246.

8. At the time he was sentenced to death, Mr. Hall was 23 years of age. Presently, Mr. Hall is 47 years old and has therefore been confined in Graterford's Capital Case/Restricted Housing Unit ("CCU/RHU") for some 24 years.

9. Over the course of Mr. Hall's 24-year confinement, he

has had some six misconducts, all of them minor and none of them involving violent behavior.

10. In the Capital Case Unit, Mr. Hall resides alone in an 84-square foot cell with an open grill cell front. The cell is furnished with a concrete table, concrete bed slab with mattress and a combination toilet sink unit. There is a light over the table which Mr. Hall is able to control. Although there are no windows in Plaintiff's cell, there are large windows across the range from his cell which permit some natural light to enter his cell, although he cannot see the outside from these windows. The lights are on in the corridor outside the cell 24-hours per day and because the cell is open-barred, it cannot ever be darkened entirely.

11. Throughout the night, prison staff perform cell checks every thirty minutes, generally using a flashlight which they frequently shine directly at Mr. Hall's face and eyes.

12. Although Mr. Hall is permitted to talk quietly to other prisoners from his cell, he is not permitted to shout or yell to another inmate and he cannot see any other inmates from the confines of his cell. He is permitted to verbally play games such as chess with other inmates within earshot on his range.

13. Mr. Hall is served and eats all of his meals alone in his cell. He receives three meals each day.

14. Like all of the inmates on the CCU/RHU at Graterford,

Plaintiff is offered recreation time up to two hours per day, five days each week, not necessarily in succession. Recreation or "yard" time may be utilized in one of two ways: either alone or with one other inmate in an individual recreation module (which Plaintiff described as a "dog kennel"), or in the larger recreation area with a half basketball court. The individual modules are approximately 184.5 square feet in size, have concrete floors, and both inmates must have the same status/security classification, be able to get along and must both agree as a pre-requisite to being able to recreate together. There are approximately 14 such cages side-by-side in the exercise yard and those inmates who are in the modules at the same time can talk to one another while they exercise.

15. During their recreation time, inmates have access to playing cards, board games and balls but recreation time can be cancelled entirely in the event of inclement weather or if something is going on in the prison or on the cell block. To utilize the larger recreation space, the inmates must sign up in advance and there is typically a three-month wait to access this privilege. In the event that recreation time is cancelled for any reason on the day an inmate is scheduled to recreate in the basketball court area, the inmate must sign up again and await his turn.

16. Inmates on Graterford's CCU/RHU are permitted to have

4

commissary privileges and to keep up to four boxes of personal property in their cells. They are also allowed to possess televisions, radios and tablets on which they may download and play video games and access email. They are allowed to have photographs and other items on the walls of their cells. Mr. Hall has a television, radio and a tablet, in addition to other books and personal property in his cell. From the commissary, inmates may order a variety of items such as batteries, newspapers, magazines, certain food items and typewriters. Commissary items are typically delivered several days after they are ordered.

17. CCU/RHU inmates are allowed to shower three times each week and exchange their laundry twice weekly. Showers are limited to fifteen minutes.

18. CCU/RHU inmates have access to the unit law library for up to two hours each day and may request and receive books from the leisure library and additional legal materials from the larger law library as well. The unit law library is slightly larger than Plaintiff's cell and contains some limited legal materials and two kiosks with two desks and computers from which inmates may conduct legal research through Lexis/Nexus and download music and video games to their tablets. Two inmates may occupy the unit library together provided they are able to get along and agree and have the same inmate status/security

classification.

19. Like other inmates in the CCU, Plaintiff can make up to three 15-minute phone calls per week and he may have visitors once each week. He may also have legal visits and visits from a religious advisor. His legal phone calls are unlimited.

20. Plaintiff is Jewish and while he could meet once a week with the religious counselor of his choosing, Plaintiff usually sees a rabbi every few weeks when he stops by. All visits, whether they are personal, legal, or religious take place in a booth with Plaintiff on one side of a glass and concrete partition and the visitor on the other side and all communications are over a phone. There is no physical contact permitted.

21. In order to maintain security on the CCU/RHU, all inmates are required to move cells roughly every ninety days.

22. Anytime that a CCU/RHU inmate leaves his cell, he is subjected to a mandatory strip search. Upon completion of the strip search, inmates are then handcuffed from behind, tethered to a dog leash and walked to wherever they are going. Because he finds this procedure so humiliating, Mr. Hall rarely leaves his cell, opting instead to usually recreate and sponge bathe in his cell.

23. Medical professionals come through the CCU/RHU daily and an inmate can make a request in advance to see them. Medications are delivered up to three times each day. There is

also a mental health counselor/psychological services specialist who is dedicated to the unit who makes rounds daily on the days of the week when she is there. In rounding the unit, the counselor stops by each cell and speaks briefly with each inmate, asking them how they are doing, if there is anything they would like to talk about with her or if there is anything that she can do for them. Although these discussions are within earshot of all of the inmates on the unit, should a particular inmate desire to discuss something privately, there is an interview module on the unit to which she can have an inmate moved by the guards and in which she can meet with them privately in the same manner in which inmates can meet with visitors from outside the prison. Further, in the event that the psychological services specialist has concerns that an inmate is beginning to decompensate or is in danger of harming themselves, there are psychiatric observation cells right on the block to which she may have them removed. There are also some peer-trained prisoners who may be available to meet with CCU/RHU inmates if they so desire.

24. There are four stability codes used for assessing an inmate's mental status. These codes are: "A" for those inmates with no history of mental health problems; "B" for those inmates with a history of some mental health treatment but who are not presently receiving treatment; "C" for those inmates who are currently receiving treatment for mental health concerns and/or

who are on medication; and "D" which is used for inmates who are seriously mentally ill, in danger of self-harm or of harming others, etc. Plaintiff's mental status is "B," although it is unclear why given that until fairly recently he was classified as "A" and there is nothing in the prison records to reflect any actions that would justify a change in his mental status.

25. Plaintiff suffers from glaucoma, asthma, hypertension and high cholesterol for which he goes to the medical unit roughly once every six months. As is the case anytime he leaves his cell, to go to the medical unit Plaintiff is first strip searched, handcuffed behind his back and tethered to a leash to be escorted to the medical unit. Once there, the guards remain in the room with him throughout the examination with the doctor and he remains handcuffed throughout the exam unless the doctor requests that the handcuffs be removed.

26. Due to the noise and lights on the cellblock, Plaintiff sleeps only about four hours per night. He feels tired during the day and is not as mentally sharp as he used to be. He also suffers from anxiety, depression, memory problems, and often feels angry. Since approximately 2013, he has suffered from periodic panic attacks. Plaintiff did seek and on two occasions in March and June, 2017, had a longer, private conversation with the psychological services specialist. He has requested more in-depth psychological care, anger management counseling and has

sought to participate in the prison's anxiety and violence management/prevention groups but has been told that those groups are only open to inmates in the general population.

27. The only job which is available to inmates in the CCU/RHU is a janitorial position paying .$92/day. In this position, there is no opportunity to interact with other people. Mr. Hall did hold this job for some time but apparently voluntarily relinquished it some 4-5 years ago.

28. While inmates with a mental status classification of "D" are reviewed once a week, the Pennsylvania Department of Corrections through a Program Review Committee ("PRC"), reviews Plaintiff's case every ninety days by holding a brief (approximately fifteen minutes) hearing to purportedly review the conditions of Plaintiff's confinement. After the customary strip search, Mr. Hall attends the PRC hearings at which he usually asks to be released from the Capital Case Unit and expresses his other complaints and concerns. Although his complaints and concerns are usually documented, at the conclusion of these hearings, Plaintiff's request to be released from restricted housing has always been denied.

29. There is some self-study, in-cell programs available to CCU/RHU inmates in basic adult education and/or to assist with earning a GED (Graduate Equivalency Diploma). Mr. Hall earned his GED prior to entering prison and therefore the available

9

self-study programs appear to be of limited benefit to him. Plaintiff has expressed interest in participating in educational and vocational training were such additional opportunities to be made available to him.

30. There are higher rates of suicide and self-harming behaviors among prisoners housed in restricted housing/solitary confinement settings than among prisoners housed in a general population environment. Similarly, there are higher rates of anxiety, depression, panic and other mental health disorders among inmates confined in restricted housing/solitary environments than among those in general population.

31. Mr. Hall does not avail himself of all of the opportunities to leave his cell and he has effectively chosen to isolate himself.

32. Mr. Hall's death sentence was vacated by the Honorable James Knoll Gardner on October 22, 2014 and the writ of execution of the writ of habeas corpus was stayed for a period of 180 days to permit the Commonwealth to grant Plaintiff a new sentencing hearing. Plaintiff appealed that part of Judge Gardner's decision denying him any relief from his first degree murder and other convictions and the Commonwealth appealed the granting of the writ with respect to and insofar as it vacated Plaintiff's death sentence to the United States Court of Appeals for the Third Circuit. Thereafter, in recognition of the moratorium on

executions in Pennsylvania imposed by Governor Thomas Wolf, the Third Circuit, with the consent and acknowledgment of the parties placed the appeal before it in civil suspense indefinitely until such time as the moratorium should be lifted.

33. Despite the vacatur of his death sentence and Plaintiff's numerous requests and entreaties to the Pennsylvania Department of Corrections that he be removed from the Restricted Housing/Capital Case Unit, the DOC has refused to do so. On October 23, 2017, Plaintiff filed this action alleging that Defendants' failure to remove him from perpetual solitary confinement and failure to provide him with a meaningful opportunity to challenge his continued confinement in the CCU/RHU violates his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. By his Motion for Preliminary Injunction, Plaintiff seeks to compel Defendants to transfer him to the general population at Graterford.

## DISCUSSION

*A. Standards for Granting Preliminary Injunctive Relief.*

The remedy of a preliminary injunction is afforded under Fed. R. Civ. P. 65, subsection (d) of which outlines the contents and scope of injunction orders:

> **(d) Contents and Scope of Every Injunction and Restraining Order.**
>
> > **(1) *Contents*.** Every order granting an injunction and every restraining order must:

> **(A)** state the reasons why it issued;
> **(B)** state its terms specifically; and
> **(C)** describe in reasonable detail - and not by referring to the complaint or other document - the act or acts restrained or required.
>
> **(2) *Persons Bound.*** The order binds only the following who receive actual notice of it by personal service or otherwise:
>
> > **(A)** the parties;
> > **(B)** the parties' officers, agents, servants, employees, and attorneys; and
> > **(C)** other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Of course, under Rule 65(a)(1), a preliminary injunction may only issue on notice to the adverse party. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867, 138 L. Ed.2d 162 (1997)(emphasis in original).

"Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." ACLU v. Black Horse Pike Regional Board of Education, 84 F.3d 1471, 1477, fn.2 (3d Cir. 1996)(quoting Gerardi v. Pelullo, 16 F.3d 1363,

1373 (3d Cir. 1994) and SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985)). "The grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequence of immediate irreparable injury." GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp., No. 05-4566, 2006 U.S. App. LEXIS 16377, 197 Fed. Appx. 120, 123 (3d Cir. 2006)(quoting U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970)). It should be noted that in order to make the required showing of irreparable harm, it is incumbent upon the plaintiff to demonstrate that he is threatened by a harm "which cannot be redressed by a legal or equitable remedy..." "The preliminary injunction must be the *only* way of protecting the plaintiff from [the] harm." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992)(quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).

In addition to having to satisfy the foregoing pre-requisites, we note that the issuance of preliminary injunctive relief in prison condition cases is further cabined by the provisions of 18 U.S.C. §3626(a)(2):

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be

the least intrusive means necessary to correct that harm.
The court shall give substantial weight to any adverse
impact on public safety or the operation of a criminal
justice system caused by the preliminary relief and shall
respect the principles of comity set out in paragraph (1)(B)
in tailoring any preliminary relief. Preliminary injunctive
relief shall automatically expire on the date that is 90
days after its entry, unless the court makes the findings
required under subsection (a)(1) for the entry of
prospective relief and makes the order final before the
expiration of the 90-day period.

*B. Propriety of Injunctive Relief in Plaintiff's Case.*

It is axiomatic that incarceration by its very nature necessitates that many rights and privileges be eliminated or curtailed. Abu-Jamal v. Price, 154 F.3d 128, 132-133 (3d Cir. 1998). What's more, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley. 482 U.S. 78, 89, 107 S. Ct. 2254, 2261, 96 L. Ed.2d 64 (1987). That having been said, however, those who are convicted of criminal offenses and imprisoned do not check their Constitutional rights at the jailhouse door. Regardless of capital or non-capital status, Plaintiff Hall is still entitled to be confined in conditions which do not violate the Eighth Amendment and is still entitled to Due Process of law under the Fourteenth Amendment. The threshold question thus remains whether Plaintiff has shown a likelihood of successfully establishing that his Constitutional rights under those Amendments is being violated by the Defendants *and* the

14

probability that he will suffer irreparable harm if an injunction is not issued. In view of the holding of the Third Circuit in Williams v. Secretary, Pennsylvania Department of Corrections, 848 F.3d 549, (2017), we believe that Plaintiff has done both.

Williams is on all-fours with the instant case. In that case, Plaintiffs were two inmates in the custody of the Pennsylvania Department of Corrections who had been sentenced to death and housed on death row following imposition of their death sentences. Eventually, their death sentences were vacated but several years passed before Plaintiffs were resentenced to life sentences without the possibility of parole. In the intervening years between vacatur of their death sentences and their re-sentencings, however, the Plaintiffs continued to be housed on death row and subjected to the deprivations of solitary confinement concomitant to such placement.

In deciding the Williams case, the Third Circuit framed the central question before it thusly:

> We are asked to decide whether there is a constitutionally protected liberty interest that prohibits the State from continuing to house inmates in solitary confinement on death row after they have been granted resentencing hearings, without meaningful review of the continuing placement.

848 F.3d at 552.

The Court then went on to summarize its subsequent holding:

> For the reasons set forth below, we conclude that there is and that the Due Process Clause of the Fourteenth Amendment therefore limits the State's ability to subject an inmate to the deprivations of death row once the death sentence

15

>  initially relied upon to justify such extreme restrictions
>  is no longer operative.

Id. In reaching this conclusion, the Third Circuit carefully considered the housing restrictions and conditions inherent in the plaintiffs' death row placements which not surprisingly virtually mirror those under which Mr. Hall now lives and has lived for the past 24 years. These include: confinement in a windowless seven by twelve-foot cell for almost 22 and 24 hours a day, with all meals being provided in the confines of the cell; four non-legal visits per month, during which Plaintiffs were "locked in a closet-sized room, behind a reinforced sheet of glass [and] not permitted physical contact with any ... visitors"; being "permitted to leave [their] cells only five times a week for two-hour intervals of exercise in the open air, in a restricted area known as the 'dog cage.' However, to enter the 'dog cage,' [Plaintiffs] first had to undergo an invasive strip search." Further, "because medical consultations were provided at [the] cell door, inmates in separate cells could hear [Plaintiffs] exchanges with medical providers, which comprised [their] privacy." And, "[d]uring the short intervals that [Plaintiffs] were not in their cells, but in the prison yard, law library, or shower, [they] were held inside a small locked cage that continued to restrict [their] movement and freedom of association."

Finally, like Mr. Hall, Plaintiff Walker in the Williams

matter, did not leave his cell for open air exercises for nearly seven years "[t]o avoid the psychological and physical intrusion of these 'full' body searches." Williams, 848 F.3d at 554-555.

In determining whether the Plaintiffs had a protected liberty interest, the Third Circuit surveyed the relevant established Supreme Court precedent in conjunction with careful consideration of the body of research detailing the "devastating psychological consequences, including a loss of a sense of self" which long-term solitary confinement can inflict on prisoners who are so confined. Suffice it to say that we see no need to regurgitate the analysis here as it is easily read. In so holding, the Third Circuit likewise rejected the argument which Defendants advance here: that they are required by the DOC policy implementing 61 Pa. C. S. §4303 to continue to confine Plaintiff on death row until such time as he is resentenced to life imprisonment.[1]

---

[1] 61 Pa. C. S. A. §4303 dictates the terms of confinement of death row inmates:

> Upon receipt of the warrant, the secretary shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement. During the confinement, no person shall be allowed to have access to the inmate without an order of the sentencing court, except the following:
>
> (1) The staff of the department.
>
> (2) The inmate's counsel of record or other attorney requested by the inmate.
>
> (3) A spiritual advisor selected by the inmate or the members of the immediate family of the inmate.

The DOC Capital Case Procedures Manual, §6.5.8, Section 1 in turn,

Given the clarity of the <u>Williams</u> holding, it seems self-evident to this Court that Plaintiff Hall is all but guaranteed to succeed on the merits of the claims he presents in his Complaint. Indeed, we are somewhat perplexed as to why Mr. Hall remains housed in the Capital Case Unit and why efforts have yet to be undertaken to transition him to General Population. Likewise, again in light of the findings and conclusions in <u>Williams</u> with regard to solitarily-confined inmates in general and in view of the evidence on the record before us that Mr. Hall already suffers from depression, anxiety, anger management, memory problems, hypertension and insomnia, among other health problems for which he has limited treatment opportunities, we

---

states:

**S.  Modification of Sentence**

    1.    In the event that an order is received modifying the sentence of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine whether the order is valid and whether the District Attorney intends to appeal the order.

    2.    If the District Attorney intends to appeal, the inmate shall not be moved from the Capital Case unit until the appeal is resolved. However, the inmate may be moved from the Capital Case unit, if the District Attorney does not file an appeal within 30 days.

    3.    If the District Attorney does not intend to appeal and if the inmate does not remain subject to an execution sentence as the result of a prosecution other than the sentence modified in the order, the inmate may be moved from the Capital Case housing unit.

    4.    Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Regional Deputy Secretary.

believe that there has been a sufficient showing that he will suffer irreparable harm if he is not granted immediate preliminary relief. So saying, we now enter the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Both this Court and the Pennsylvania Department of Corrections are bound by the decision of the U.S. Court of Appeals for the Third Circuit in <u>Williams v. Secretary, Pennsylvania Department of Corrections</u>, 848 F.3d 549 (2017) that formerly death-sentenced inmates have a clearly established due process right to avoid unnecessary and unexamined solitary confinement on death row.

3. As <u>Williams</u> makes clear, inmates who no longer have active death sentences may not continue to be reflexively housed in solitary confinement without individualized justification and a showing that such confinement is required for a legitimate penological purpose.

4. Defendants, in continuing to house Plaintiff Darrick Hall in the Capital Case/Restricted Housing Unit at Graterford Prison despite his death sentence having been vacated in October, 2014, have violated Plaintiff's rights to substantive and procedural due process under the Fourteenth Amendment to the U.S.

19

Constitution. This right has been clearly established since February 9, 2017 when Williams was decided.

5. Plaintiff has demonstrated a strong likelihood that he will succeed on the merits of the claims raised in his Complaint were this matter to proceed to trial.

6. Plaintiff has demonstrated that in the absence of the issuance of a preliminary injunction he will suffer and will continue to suffer immediate irreparable harm for which there is no adequate remedy available at law.

7. Plaintiff is entitled to an immediate hearing providing meaningful review of his placement in the CCU/RHU, taking into account such factors as the safety of other inmates and staff, Plaintiff's continued public or institutional risk, Plaintiff's disciplinary history, Plaintiff's mental health history and current mental health status, and his physical health history and present health status, among other relevant considerations.

An appropriate Order follows.